# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

| | |
|---|---|
| LORI B. BONO, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:18 CV 48 DDN ) |
| ANDREW M. SAUL,[1] Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the Commissioner of Social Security denying the applications of plaintiff Lori B. Bono for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born on September 10, 1976. (Tr. 282). She filed her applications for DIB under Title II and for SSI under Title XVI on November 24, 2014. (Tr. 143-44). Plaintiff was last insured on June 30, 2016. (Tr. 282). She alleges she became disabled on August 31, 2012, the date she last held employment, based on the following impairments: bipolar disorder, depression, post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), anxiety, panic disorder, mood disorder, chronic obstructive pulmonary disease ("COPD"), gastroesophageal reflux disease ("GERD"), edema, fibromyalgia, and severe back

---

[1] Andrew M. Saul is now the Commissioner of Social Security. *See* https://www.ssa.gov/agency/ commis-sioner.html   Pursuant to F. R. Civ. P. 25(d), Mr. Saul is hereby substituted for the Hon. Nancy A. Berryhill as the defendant in this suit. No further action needs to be taken to continue this suit. 42 U.S.C. § 405(g) (last sentence).

pain. (Tr. 99, 282, 286). Her application was initially denied on December 26, 2014. (Tr. 147). On January 22, 2015, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 156).

On October 6, 2017, following a hearing, an ALJ issued a partially favorable decision finding that plaintiff was not disabled as defined in the Act until June 23, 2016. (Tr. 30). Plaintiff submitted a request for review by SSA's Appeals Council, which was denied on May 11, 2018. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

Plaintiff's action challenges the ALJ's evaluation of her mental condition between August 31, 2012, and June 23, 2016. Because plaintiff does not challenge the ALJ's evaluation of her physical impairments, discussion is limited to the following medical history relevant to this action.

Plaintiff has been treated by David Goldman, D.O., since 2002 and met with him every six weeks since at least May 3, 2012. (Tr. 102-03, 205). She also speaks with Genia Perry, a counselor, two to three times a week. (Tr. 103). Jeffry Evans, M.D., has been plaintiff's primary care physician since at least 2014. (Tr. 434, 435, 438).

On May 29, 2013, Dr. Goldman diagnosed plaintiff with PTSD, ADHD, bipolar disorder, and episodic mood disorder. (Tr. 444). Between 2012 and 2016, plaintiff met with Dr. Goldman every six weeks for medical evaluation. (*Id.*). In that time, Dr. Goldman reported general stability in plaintiff's mental health and normal medical evaluations. (Tr. 442, 446-47, 451-52, 456-57, 461-62, 466-67, 523-24, 530-31, 537-38, 544-45, 551, 556-57, 563-64, 717-18). Between 2012 and 2016, plaintiff also showed good medication response, was compliant with her medications, and was cooperative during appointments. (Tr. 23, 24, 442, 447, 456, 461, 466, 523, 544, 550, 556, 563, 715-17).

There were some exceptions to plaintiff's generally normal evaluations. On January 11, 2013, plaintiff arrived looking tired with a constricted affect after her son's best friend overdosed and died in her house. (Tr. 24, 716). Plaintiff was reported to have had an abnormal appearance and affect on November 23, 2013, when she complained of being stressed about her mother having a heart attack three weeks prior and reporting "fair" sleep. (Tr. 451-52). On December 3,

2014, plaintiff was reported to have a flat affect and a depressed mood. (Tr. 570, 575). On December 10, 2015, plaintiff again was reported to have a flat affect and a depressed mood and described struggling with coping with her mother's death. (Tr. 586, 591).

On June 23, 2016, Dr. Goldman submitted a medical source statement ("MSS") of plaintiff's ability to do work-related activities. (Tr. 632). In the statement, he listed plaintiff's ability to understand, remember, and carry out simple instructions as moderately limited; her ability to make judgments on simple work-related decisions as markedly limited; and her ability to understand and remember complex instructions as moderately limited. (Tr. 632). He listed her ability to carry out complex instructions as moderately limited, noting she had a marked limitation on her ability to make judgments on complex work-related decisions. (*Id.*). In the MSS, Dr. Goldman also wrote that because of plaintiff's anxiety, PTSD, and bipolar disorder, she had a marked limitation on her ability to interact appropriately with supervisors and co-workers, and a marked limitation on her ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 633). Dr. Goldman wrote further that plaintiff's conditions would cause her to miss more than four days a month of work, and that twenty-five percent or more of her work time would be "off task." (Tr. 633-34).

### III. HEARING TESTIMONY

On August 23, 2016, the hearing before the ALJ was held. (Tr. 91).

**A. Plaintiff's Testimony**

Plaintiff is a 36-year-old female who is married with two children and lives in New London, Missouri. (Tr. 99-101). She has an eleventh grade education and failed to graduate from high school, but later received CNA and CMA certifications. (Tr. 102). Both certifications are not current. (*Id.*). Her last gainful employment was working at Dollar General, which ended August 31, 2012. (Tr. 99-100). She was fired because she could not correctly hang shelves and follow directions. (Tr. 100).

Plaintiff has been diagnosed with various health issues and has cited her mental health conditions as the reason for her inability to work. (Tr. 102). She testified that due to her bipolar disorder, she will lash out at others for no reason, with three or more bad days a week. (Tr. 103). Plaintiff described bad days as ones where she is not pleasant to be around, generally grouchy, screams at everyone and cannot control her anger, uses foul language, stays in her night clothes,

3

does not bathe, and does not do any housekeeping work. (Tr. 104-05). Plaintiff testified that at least twice a month, she isolates herself in her bedroom and spends all day in bed sleeping. (Tr. 104).

Additionally, plaintiff testified that her ADHD makes her easily distracted because it is difficult to concentrate. (Tr. 105). She stated that she would start cleaning upstairs, go downstairs to get something and start cleaning down there, and then forget what she was doing upstairs. (*Id.*).

Plaintiff further testified that she has an anxiety disorder. (Tr. 106). She stated that she does not like to be around people, because when she is, she breaks out in sweat and "freaks out." (*Id.*). She also noted that she has panic attacks when she is around numerous people and that panic attacks occur three or more times a week. (*Id.*). The panic attacks are especially difficult when she is at the store. (Tr. 107).

Plaintiff explained that while she does go shopping, she does not leave her home by herself. (Tr. 112). She testified that she makes whoever is at home go with her on errands outside the home, including to doctors' appointments, because she will "freak out." (*Id.*). She can drive, but does not like leaving her home, which she views as her protective environment. (Tr. 112-13). She visits the store weekly and has problems three to four times a month. (Tr. 113). When she has an anxiety attack at the store, she starts sweating and sits for 20 minutes in the bathroom until the person she is with helps her finish shopping. (*Id.*).

Plaintiff spoke of how she has PTSD from an ex-husband who used to physically abuse her. (*Id.*). She testified that he used to tie her to a bed and carve foul language on her body with a razor blade. (*Id.*). She also stated that he ripped out her bangs, held her hostage in a car while holding a screwdriver, stopped her from seeing her family, and locked her in their home. (*Id.*).

Plaintiff testified that as a result of her abuse and PTSD, she experiences nightmares three to four times a week. (Tr. 108). When she wakes up, she is stressed and usually experiences one of her bad days accompanied by flashbacks and extended crying spells. (Tr. 109). She also wants to be alone when flashbacks occur. (*Id.*).

Plaintiff testified due to her depression, she sits in her chair and has little motivation to get up and do anything. She experienced a dark depression after her mother passed away on September 25, 2015. (Tr. 110).

4

**B. Vocational Expert Testimony**

A Vocational Expert ("VE") testified that plaintiff had performed the following past work: (1) stock clerk, (2) cashier II, (3) and nurse's assistant. (Tr. 122).

The ALJ posed three hypothetical questions to the VE regarding plaintiff's work ability. The ALJ first asked the VE to consider a hypothetical individual with plaintiff's age, education, and work history who is limited to medium level work; can perform work limited to simple, routine tasks, with few workplace changes; would be off task five percent of the time in addition to regularly scheduled breaks; and could have occasional interaction with the public, coworkers, and supervisors. (*Id.*). The VE responded that the hypothetical individual could not do plaintiff's past work; instead the subject could work as a cleaner II, laundry worker II, and hand packager. (*Id.*).

The ALJ then asked the VE to assume that all of the limitations given to the hypothetical person in the first scenario remain the same, but that the person would need at least one extra break of 15 minutes per day. The VE testified that this addition would eliminate all positions at all exertional levels. (Tr. 123).

The ALJ's final hypothetical question asked the VE to keep all limitations in the first hypothetical but with the addition that the person would miss two days per week. (Tr. 124). The VE testified that this would eliminate all positions. (*Id.*).

Plaintiff's attorney asked the VE if the ALJ's hypothetical individual had the additional factor of marked impairments interacting with supervisors and co-workers, how often such an individual could interact inappropriately (e.g., raising one's voice, using foul language, or crying, but not engaging in an altercation) with supervisors and co-workers and still be deemed employable. (Tr. 125-26). The VE testified that any initial inappropriate behavior towards a co-worker would result in a reprimand, and any subsequent behavior would be cause for termination. (Tr. 126). The VE also testified that while any inappropriate behavior towards a supervisor would be job and employer specific, generally one major verbal altercation would result in termination. (*Id.*).

Plaintiff's attorney further asked, following the hypothetical, how a job's availability would be affected if the individual had to be reminded of how to perform the job once or twice a day. (*Id.*). The VE testified that if the person had to be redirected or reminded twice a day during

the first five days of employment, the person would not be able to maintain the position. (Tr. 127).

**C. Supplemental Hearing**

On July 19, 2017, psychiatrist Ashok Khushalani, M.D., a Medical Expert ("ME"), testified in a supplemental hearing. (Tr. 45). The ME agreed that that it was medically necessary for plaintiff to be in treatment with a psychiatrist and to see a caseworker once a week, as she had been doing. (Tr. 51-52).

Plaintiff's attorney asked the ME about comments made in his interrogatory regarding plaintiff's response to attending July 4th fireworks. (Tr. 55). The ME had written that it was "pretty impressive" that someone with PTSD like plaintiff could attend the function and enjoy it, because a place that that (with loud noises, unfamiliar faces, and crowds) usually bring about a lot of anxiety. (*Id.*).

The ME testified further that plaintiff would have moderate limitations in her ability to interact with the public, because PTSD can cause individuals to have difficulty interacting with people on an intimate basis. (Tr. 64-65). He stated that there was no evidence to show that plaintiff had marked limitations, since she was relating well with her therapist, was caring for her grandson, and had cared for her mother before she died. (*Id.*). The ME could not say at what frequency plaintiff's not leaving her home would have to be elevated to make it a marked limitation, but he opined that a hypothetical individual who was unable to leave four times in a month would probably be considered to have a marked limitation. (*Id.*).

The ME was unable to state where plaintiff's record indicated how often she was having the problems that would cause more or fewer limitations, since most of the medical records show her mental status as normal. (Tr. 66).

The ME did not know what plaintiff meant when she reported a limited ability to leave her home due to anxiety. However, he did state that her ability to care for her grandchildren shows that she can function within her family, and that Dr. Goldman would know what "limited ability" means since he wrote the medical record. (Tr. 69-70).

The ME testified that plaintiff has PTSD and bipolar disorder, but he had not seen any medical assessments where plaintiff had been diagnosed with both bipolar disorder and ADHD, or both PTSD and ADHD. (Tr. 72). He agreed that people with bipolar disorder have good and

bad days, and people with PTSD can have flashbacks (*Id.*). He also agreed that plaintiff could have two to three bad days a week because of her bipolar diagnosis, but that her other reported symptoms could come from her bipolar or from other diagnoses. (Tr. 73). He agreed that some of plaintiff's symptoms were consistent with a diagnosis of PTSD as well. (Tr. 74).

Plaintiff's attorney asked the ME about Dr. Goldman's MSS. The ME testified that the record did not state the frequency with which plaintiff's symptoms were occurring and could not support a finding of moderate impairment. (Tr. 76). The ME stated that while the MSS reported plaintiff's emotional volatility, it was not consistent with the medical record. (Tr. 78).

The ME testified that several of Dr. Goldman's opinions in his MSS were not supported in the medical record, including: plaintiff needing to miss more than four days of work a month, plaintiff's flashbacks interfering regularly in her life, and plaintiff needing unscheduled breaks daily for 20 to 30 minutes. (Tr. 79-81).

On August 31, 2017, and in response to the supplemental hearing testimony of Dr. Khushalani, Dr. Goldman submitted a letter in support of his MSS. (Tr. 898). He stated that his treatment notes were not intended to be an accurate assessment of a patient's over-arching mental illness because they described short appointments during which plaintiff could maintain composure and respond politely. (Tr. 898-900). He stated further that any patient could dress appropriately and appear intact for fifteen minutes. (*Id.*). Dr. Goldman opined that plaintiff's ability to interact with others was greatly disrupted and that more weight should be given to his 2016 MSS. (Tr. 900).

## **IV. DECISION OF THE ALJ**

On October 6, 2017, the ALJ issued a partially favorable ruling stating that plaintiff was not disabled under the Act prior to June 23, 2016, but was disabled on and after June 23, 2016. (Tr. 12-30). The ALJ chose June 23, 2016 because plaintiff's conditions seemed to gradually worsen over time, and Dr. Goldman's medical records regarding plaintiff's symptoms and limitation became consistent with the evidence and the MSS from that date onward. (Tr. 26).

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since the alleged onset date of August 31, 2012. (Tr. 19). At Step Two, the ALJ found that plaintiff has the following severe impairments: bipolar disorder, ADHD, episodic mood disorder not otherwise specified, PTSD, and fibromyalgia. (*Id.*). At Step Three, the ALJ found that plaintiff

does not have an impairment or a combination of impairments that meets or is medically equal to the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19).

At Steps Four and Five, the ALJ considered plaintiff's abilities and the medical record before June 23, 2016, and after June 23, 2016.

**A. Prior to June 23, 2016**

The ALJ considered the record and determined that prior to June 23, 2016, plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c), except with two limitations: (1) plaintiff could perform only simple, routine tasks in a job with few workplace changes; and (2) plaintiff could tolerate only occasional interaction with the public, coworkers, and supervisors. (Tr. 21). After considering the evidence, the ALJ found that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements about the intensity, persistence, and limiting effects of the symptoms were not fully supported prior to June 23, 2016. (Tr. 22).

The ALJ considered and weighed all of the medical opinion evidence. For her determination about plaintiff's disability eligibility prior to June 23, 2016, she gave limited weight to the opinions of David Goldman D.O., the primary treating, because Dr. Goldman's initial opinions were not consistent with the medical record evidence. (Tr. 24). The ALJ also gave partial weight to Dr. Goldman's letter provided after the supplemental hearing, because the statement was only partially consistent with his own treatment notes and the notes of Dr. Jeffry Evans, plaintiff's primary care physician. (Tr. 25).

The ALJ gave some weight to the opinions of the ME, Dr. Khushalani, who responded to interrogatories and later testified in the supplemental hearing, because his findings and opinions were generally supported by the medical record evidence. (Tr. 24-5).

The ALJ gave little weight to the Global Assessment of Functioning ("GAF") scores assigned to plaintiff, because the scores remained unchanged even though medical records indicated plaintiff was doing well. (Tr. 26).

The ALJ gave little weight to the opinion of the state agency psychological consultant, because he was unable to assess the severity of accompanying limitations or provide an RFC assessment. (*Id.*).

**B. After June 23, 2016**

The ALJ then determined that following June 23, 2016, plaintiff has had the RFC to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: (1) plaintiff can only perform simple, routine tasks in a job with few workplace changes; (2) plaintiff can only tolerate occasional interaction with the public, coworkers, and supervisors; (3) plaintiff must be off-task five percent of the workday; and (4) plaintiff must miss two days of work per month. (*Id.*).

The ALJ gave controlling weight to most of Dr. Goldman's opinions after June 23, 2016, because his observations and notes detailing plaintiff's changed mental health status were generally consistent with the medical record evidence. (Tr. 27).

The ALJ also gave some weight to Dr. Goldman's letter concerning his MSS, dated August 31, 2017, because it supported some of plaintiff's behavior as of the established onset date. (*Id.*).

Finally, the ALJ gave significant weight to Dr. Khushalani's assessment and testimony because they generally support plaintiff's symptomology detailed in later treatment notes. (*Id.*).

At Step Four, the ALJ found that since August 31, 2012, plaintiff has been unable to perform any past relevant work. (Tr. 27-28).

At Step Five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, prior to June 23, 2016, there were jobs existing in significant numbers in the national economy that plaintiff could have performed. However, after June 23, 2016, considering plaintiff's age, education, work experience, and RFC, there were no jobs existing in significant numbers in the national economy that plaintiff could perform. (Tr. 28-9). Accordingly, the ALJ found that plaintiff was not disabled prior to June 23, 2016, but became disabled on that date. (Tr. 29).

# V. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least 12 continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. *Pate-Fires*, 564 F.3d at 942. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five. *Id.* At this final step, the Commissioner considers the claimant's RFC in conjunction with her age, education, and work experience to determine if the claimant retains the requisite RFC to adjust to other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## VI. DISCUSSION

Plaintiff argues that the ALJ erred in not granting controlling weight to Dr. Goldman's opinion about her condition prior to June 23, 2016. (Doc 16 at 18). Plaintiff also argues that even if Dr. Goldman's opinion is not entitled to controlling weight, the ALJ should have considered the 20 C.F.R. § 404.1527(d) medical source evaluation factors since the claim was filed prior to March 27, 2017. (Doc 16 at 21). Plaintiff finally argues that if the ALJ believed that a provider's treatment notes could not assist her in determining disability, given the claimant's extensive treatment history, she was obligated to contact the doctor for additional evidence or clarification, which the ALJ did not do. (Doc 16 at 22). The Court disagrees.

### A. Treating Physician's Opinion

Plaintiff contends the ALJ erred by not giving controlling weight to the opinion of her long-term treating psychiatrist, Dr. Goldman, prior to June 23, 2016. The treating physician rule is stated clearly in 20 C.F.R. § 416.927(d)(2): a treating physician's opinion is generally given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Cline v. Colvin,* 771 F.3d 1098, 1103 (8th Cir. 2014); *see also Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005).

Plaintiff correctly asserts that a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). However, that weight is neither inherent nor automatic, and it does not obviate the need to evaluate the record as a whole. *Cline,* 771 F.3d at 1103. The Commissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. *Id.* Regardless of how much weight is given to an opinion, the ALJ must provide "good reasons" for the weight allotted but is not required to discuss every factor considered. *Id.; see also* 20 C.F.R. § 404.1527(c)(2).

The Court concludes that there is substantial evidence to support the ALJ's decision not to give controlling weight to Dr. Goldman's opinion prior to June 23, 2016, due to inconsistencies between the physician's stated opinion and his examination notes. *See Davidson*

*v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

In his MSS, Dr. Goldman opined that plaintiff had moderate limitations in understanding, remembering, and carrying out simple instructions, as well as interacting with the public. (Tr. 632-33). He also stated that plaintiff had marked limitations making simple work-related decisions and making judgments on complex work-related decisions. (*Id.*). He wrote that plaintiff had marked limitations interacting with supervisors and coworkers and responding appropriately to usual work situations. (Tr. 633). He further opined that plaintiff would miss more than four days per month of work; would be off task 25 percent or more; and would need unscheduled breaks due to panic attacks, anxiety, and crying spells. (Tr. 633-34). He finally opined that plaintiff's disability began August 31, 2012. (Tr. 634).

Dr. Goldman also submitted a letter in support of his MSS on August 31, 2017, in which he stated that his treatment notes were not intended to be an assessment of a patient's over-arching mental illness because they recorded short appointments in which a patient can maintain composure and respond politely. (Tr. 25, 898-900). He further stated that while any patient could dress appropriately and appear intact for fifteen minutes (*id.*), the plaintiff's ability to interact with others was greatly disrupted. (Tr. 900).

The ALJ observed, however, that Dr. Goldman's mental examination notes dated near plaintiff's alleged onset date of August 31, 2012, do not report signs consistent with severe mental symptoms. (Tr. 22). In fact, Dr. Goldman's multiple treatment notes largely documented normality not only in plaintiff's appearance, behavior, activity level, and orientation, but also in her speech, affect, thought process, insight, judgment, cognition, and impulse control. (Tr. 715, 442, 446-47, 451-52, 456-57, 461-62, 466-67, 523-24, 530-31, 537-38, 544-45, 551, 556-57, 563-64, 717-18). During a visit with Dr. Goldman on September 7, 2012, a week after plaintiff's alleged onset date and a few days after being fired from her work, Dr. Goldman listed plaintiff has having normal appearance, behavior, activity level, orientation, affect, judgment, and cognition. (Tr. 718). A visit on April 5, 2016, the closest examination to when Dr. Goldman wrote his MSS, Dr. Goldman noted plaintiff to be entirely normal. (Tr. 564). While plaintiff presented abnormally on several occasions during this period when plaintiff experienced significant stressors, the majority of Dr. Goldman's notes indicated that she appeared to be normal and was responding well to medications, which, as the ALJ observed, does not suggest

uncontrolled symptoms despite medication compliance. (Tr. 24, 451-52, 575, 599). *See also Brown v. Astrue,* 611 F.3d 941, 955 (8th Cir. 2010) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (quoting *Brace v. Astrue,* 578 F.3d 882, 885 (8th Cir, 2009)).

In addition to Dr. Goldman's medical statements, the ALJ also noted that plaintiff's primary care physician, Dr. Jeffry Evans, observed plaintiff to have normal mood and affect during her visits. (Tr. 23, 435, 438). She additionally pointed out that plaintiff's adult community psychiatric rehabilitation services annual reviews documented her as being without severe symptoms or limitations. (Tr. 24).

The ALJ's analysis took into account statements by plaintiff, recorded in Dr. Goldman's medical examination notes, describing her ability to perform a variety of activities. Substantial evidence in the record showed that plaintiff spoke of going into town frequently, cooking a Christmas meal all by herself, spending time with friends, taking her daughter to appointments, and self-reporting that she was too busy to work. (Tr. 24, 523, 556,). The ALJ also considered plaintiff's reports of good responses to medication and that she was doing well. (Tr. 25). Because of this, substantial evidence supports the ALJ's decision to give limited weight to Dr. Goldman's medical opinion for this time period, due to inconsistencies between the written statements and the treatment notes.

## B. Application of 20 C.F.R. § 404.1527(d)

Second, plaintiff argues that since her claim was filed before March 27, 2017, the ALJ should have used the 20 C.F.R. § 404.1527(d) medical source evaluation factors when considering Dr. Goldman's opinion. (Doc 16 at 21). These factors include (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of treatment relationship, (3) supportability with relevant medical evidence, (4) consistency between the opinion and the record as a whole, (5) the physician's status as a specialist, and (6) any other relevant factors brought to the attention of the ALJ. *See* 20 C.F.R. § 404.1527(c) (1)-(6). However, just because the ALJ does not explicitly mention the factors does not mean that they were not taken into consideration. The ALJ must only give "good reasons" for the weight assigned, and is not required to provide definite articulation. *See* 20 C.F.R. § 404.1527(c)(2); *see also Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005); *Singh*, 222 F.3d at 452.

The ALJ's decision does not explicitly show how the ALJ balanced the facts against each of the § 404.1527(c) factors. However, the decision does provide good reason for discounting Dr. Goldman's opinion: namely, the opinion was significantly inconsistent with the medical evidence of record, including Dr. Goldman's own treatment notes and the notes of plaintiff's other treating physician. The ALJ's conclusion is adequately supported by substantial evidence and the ALJ appears to have considered the factors outlined in 20 C.F.R § 404.1527(d).

**C. Duty to Develop the Record**

Finally, plaintiff argues that the ALJ was obligated to contact Dr. Goldman for additional evidence or clarification if she believed his treatment notes could not assist her in determining disability, given plaintiff's extensive treatment history with him. (Doc 16 at 22). Plaintiff claims that because the ALJ determined Dr. Goldman's opinion was inconsistent with his treatment notes, she was required to seek further clarification through interrogatories or a supplemental hearing. (Doc.16 at 23). The Court disagrees.

In *Goff v. Barnhart*, the plaintiff argued that the ALJ was required to contact the plaintiff's physicians for clarification before discounting their opinions. *Goff*, 421 F.3d at 791. The Eighth Circuit Court of Appeals noted that "while the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Id.* The court explained further that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Id.; see also* 20 C.F.R. §§ 404.1512(e), 416.912(e). The court held that because there was no issue with the adequacy of the doctor's record or the validity of the medical diagnostic techniques used, the ALJ could lawfully discount the physician's opinions without seeking clarification because the opinions were, instead, inconsistent with other substantial evidence. *Id.; see also Anderson v. Astrue,* 696 F.3d 790, 793 (8th Cir. 2012) (an ALJ may disregard the opinion of a treating physician where a treating physician renders inconsistent opinions that undermine the credibility of those opinions).

In this case, the ALJ did not find Dr. Goldman's records unclear, incomplete, or inadequate, nor did she find that Dr. Goldman used unacceptable clinical techniques. Here, the ALJ made her decision based on inconsistencies between his opinion and other substantial evidence provided by the record. All crucial issues had been properly developed in the record, and the physician's opinion did not need to be clarified. Accordingly, the ALJ was not obligated to further develop the record, and did not err by failing to do so.

## VII. CONCLUSION

For the reasons set forth above, the Court concludes the Commissioner's final decision is supported by substantial evidence in the record as a whole. The decision of the Commissioner is affirmed. An appropriate Judgment Order is issued herewith.

              /s/ David D. Noce    
              **UNITED STATES MAGISTRATE JUDGE**

**Signed on July 12, 2019.**